# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0482
Filed July 22, 2026

———————————

**In the Interest of R.C., Minor Child,**

**S.C., Mother,**
Appellant,

**R.C., Father,**
Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Lynn Poschner, Judge.

———————————

**AFFIRMED ON BOTH APPEALS**

———————————

Deborah L. Johnson of Deborah L. Johnson Law Office, P.C., Altoona,
attorney for appellant mother.

Cole J. Mayer of Juvenile Public Defender, Des Moines,
attorney for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Shannon L. Wallace of Youth Law Center, Des Moines, attorney and
guardian ad litem for minor child.

———————————

Considered without oral argument
by Greer, P.J., and Buller and Langholz, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

A mother and father separately appeal from a child-in-need-of-assistance (CINA) dispositional order regarding R.C. (born July 2025). For the reasons that follow, we affirm on both appeals.

The mother is living with the consequences of a traumatic brain injury. She has physical limitations, uses a wheelchair, and there is inconsistent record evidence on whether she can adequately care for herself since the injury. The father testified at one point that his "hands are so full just taking care of" the mother, he had to "do everything" for her, and she could not be left alone to take care of herself. He equivocated on whether she could care for the child, telling the Iowa Department of Health and Human Services (HHS) workers she could not do so but also testifying in one hearing she could "possibly with assistance" and with a risk of dropping the child, but he "would not leave [the mother] and the baby alone." In a later hearing, the father said the mother was "mentally incapable of taking care of herself" and had punched herself in the stomach during her pregnancy.

The mother has declined most services offered by HHS. The primary reason, as found by the juvenile court, was the mother's distrust of other women around the father—and most service providers were women. The mother apparently believes or worries that any women interacting with the father are trying to seduce him or otherwise disrespecting her. She has called service providers and HHS workers "whores." According to the father, the mother is inconsistent with taking her medications. The mother admits she has what she calls "behavioral seizures." The father described these as the mother "screaming" and "try[ing] to hit herself." She has scratched him during these instances where she is, in the father's words, "raged out."

Both parents were essentially fired by their mental-health providers due to lack of engagement and inconsistent attendance. The mother seems interested in relationship counseling but less interested in addressing her own deficits. A mental-health evaluation found significant concerns for the father's parenting due to his paranoid delusions, psychopathology, and related diagnoses. The father described himself as having problems with post-traumatic stress, depression, and anxiety. He said one of the reasons he couldn't attend therapy is he couldn't leave the mother alone. HHS has encouraged the mother to work with a domestic-abuse advocate, given the father's degrading behavior directed toward her; she was not interested.

In the months leading up to disposition, both parents continued to struggle with caring for the child even during short periods at fully supervised separate visits. The father often became "escalated and angry" during visits, with much of that anger directed at HHS through threats and derogatory or racist statements. He described HHS workers as "demons" and said people were "eating babies." Some of the father's comments, including racial slurs, were directed at the mother and the child. On at least one occasion, police were called due to the parents' conduct, leading to subsequent visits being located at the justice center. During one visit, the mother became so upset at the father she could not hold the child properly and the child started to roll off her lap; a service provider caught the child before he fell to the floor. In HHS's view, the parents' continued relationship—and arguing—hinders reunification.

The parents do not attend the child's medical appointments despite their apparent ability to do so. When a nurse practitioner called the father about a health concern that arose during one of the child's appointments, the

father yelled at her on the phone, ignored the child's needs, and blamed the foster parents.

In testimony across multiple hearings, the father was nonresponsive and combative with questioners. It is difficult to tell whether he truly did not understand questions or was deliberately not engaging. For example, when asked why the child was born at home instead of the hospital, he said: "I think the baby was born so God can expose the wickedness that has been done." When asked about the mother's jealousy at the hospital when the nurses were providing care, he said "I feel like somebody's in the background. I don't know. Working witchcraft." He also ascribed his difficulties with the juvenile court system to "racists" and "wickedness." During the disposition hearing, he had multiple outbursts: calling an HHS worker "crazy" and saying HHS "kidnapped" the child during the worker's testimony. During his testimony, he said HHS "conspired, kidnapped," and "stole" the child. He also made racially charged comments, like "I love white folks, but I hate evil crackers."

For her part, the mother testified at the dispositional hearing that HHS's report was "nothing but complete lies." She called the home health aides "thieves and disrespectful." She said the workers flirted or otherwise inappropriately interacted with the father, asserting there was not "one single real professional in the entire state of Iowa." By her own admission, the mother's relationship with the father was "[n]ot necessarily healthy." This was consistent with HHS's view that it would be difficult for the child to reunify with the parents if they remained in a relationship.

The juvenile court found "[n]either parent has any insight into the changes they need to make in order to safely parent" the child. They do not recognize the deficits that led to the removal and have taken few, if any, steps to remedy them. And neither has put the child first—the mother prioritizing

5

the father over the child, and the father prioritizing the mother and his conspiracy theories. Despite suggestions from the parents to the contrary, the court found neither parent had meaningfully engaged with services.

The court found that, while both parents loved the child, returning the child to their custody posed a clear danger of adjudicatory harm. The court ordered removal be continued, and both parents appeal.

By law, the court was required to order "the least restrictive disposition appropriate considering all the circumstances of the case." Iowa Code § 232.99(4) (2025). And the preference is that a child remains at home with his or her parents. *Id.* § 232.102(4)(a). But "[t]he most important consideration in any CINA case is the best interests of the child," and the juvenile court is permitted to continue removal if doing so would protect the child from adjudicatory harm. *Id.* § 232.102(4); *In re D.D.*, 653 N.W.2d 359, 362 (Iowa 2002). "We review CINA cases de novo." *D.D.*, 653 N.W.2d at 361.

Both parents contest the fact-findings made by the juvenile court. The father urges that he was more compliant with services than the court suggested, that his derogatory comments weren't that bad and didn't impact his parenting, and that, while "[h]e agrees that he has had mental health issues," they are not "to such a significant degree that he cannot parent" the child. The mother suggests we should credit the father's later statement he could care for both the mother and the child, rather than his initial statement he could not do so. To the extent these claims turn on contested credibility determinations, we defer to the findings of the juvenile court that saw these parents in person. Beyond that, there is significant evidence supporting all of the pertinent fact-findings made by the juvenile court: the parents failed to meaningfully engage with services, particularly the father with regard to his

6

paranoia and other mental-health issues and the mother with regard to her jealousy and the dynamics of her relationship with the father.

Both parents also contest whether visits should remain at HHS discretion. Neither parent's argument on this issue is particularly clear. For the father, the only portion of his claim that is not duplicative of his removal argument is that his "concerning outburst[s] and behaviors would go away if he was allowed to fully parent his child." We have no reason to believe that premise is true. And even if it were, it does not provide a basis to disturb the juvenile court's order. The mother makes only a conclusory challenge that she thinks the visits should be unsupervised and with both parents, seeing "no need" for HHS to have discretion over visits. On this record, giving appropriate deference to the fact-findings below, we have no basis to disturb the status quo. To the extent either parent wishes to seek relief from the juvenile court regarding visitation in the future, they can do so. We express no opinion on such a request, as it will depend on the facts and circumstances at the time.

Last, the mother asserts that the juvenile court abused its discretion in ordering that she contact a domestic-abuse advocate. This error was not preserved by any legal argument below, and certainly no argument was made that ordering the mother to contact an advocate was an abuse of the court's discretion or unsupported by the facts or law. The mother herself, when asked if she agreed with this recommendation, responded: "Yes and no." We conclude error was not preserved. And even if it was, the facts in this record gave the juvenile court a reasonable basis to require the mother to engage with services related to domestic abuse, and we would discern no abuse of discretion if the claim were properly before us.

**AFFIRMED ON BOTH APPEALS.**